**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

|  |  |  |
|---|---|---|
| ANNA BALOGH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. NO. 07-11086-RBC |
| | ) | |
| HILLARY CLINTON, in her official | ) | |
| capacity as Secretary of State for the | ) | |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

_____)

**DEFENDANT'S MEMORANDUM IN SUPPORT OF HER**
**MOTION FOR SUMMARY JUDGMENT**

Now comes defendant, Hillary Rodham Clinton, Secretary of State for the United States

of America (hereinafter "defendant", "State Department", "Department of State" or

"Department"), by and through her attorney, Michael K. Loucks, Acting United States Attorney

for the District of Massachusetts, and herein submits this Memorandum in Support of her Motion

for Summary Judgment.  For the reasons set forth below, the facts show that defendant is entitled

to judgment as a matter of law.

I.     **INTRODUCTION**

Anna Balogh (hereinafter "plaintiff") brought suit against the Department of State under

the Rehabilitation Act.  29 U.S.C. § 791,[1]  and under the Foreign Service Act, 22 U.S.C. §3905,

et. seq., alleging that she should have been admitted into the Foreign Service after she applied in

---

[1]  The Rehabilitation Act, which applies to federal employees and applicants, incorporates the
Americans with Disabilities Act standards.  Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6,
12 n. 1 (1st Cir. 2004).

2003.  The Department has a worldwide availability requirement that requires persons hired as Foreign Service Officers to be able to serve at any of the State Department's approximately 270 posts worldwide.  As a condition of employment, applicants must receive medical clearance from the State Department that they are worldwide available.  As part of the medical exam process, the State Department does an individualized assessment of the applicant's medical condition and assesses whether the individual would be able to serve at all the posts based upon the conditions at the posts, including the availability of medical care and prevalence of disease. Plaintiff alleged that she should have been hired by the State Department because she asserts that she is able to self monitor her Type 1 diabetes, and she believes that she is capable of traveling anywhere in the world.  Defendant has determined that since plaintiff is dependent on insulin to be administered, regulated and monitored on a daily basis, she would not be worldwide available as a significant number of the overseas posts are in locations that have a prevalence of diseases such as malaria and dengue fever that would make maintaining appropriate glucose levels extremely difficult even for trained medical professionals.  A large number of these posts lack adequate medical care and do not have any emergency care facilities.  Plaintiff also did not possess any compelling skill that was otherwise unfulfilled by the candidate pool to justify an administrative waiver of the 100% worldwide available selection criterion.  As a result, the State Department denied plaintiff employment.  Defendant submits that plaintiff was not disabled under the Americans with Disabilities Act ("ADA") and cannot establish a prima facie case of discrimination.[2]

---

[2]   On October 8, 2009, this Court Ordered that the ADA Amendments Act of 2008, effective January 1, 2009, does not apply to the plaintiff's complaint (see Docket #37 Memorandum and Order).

Even if plaintiff were to present a prima facie case, the worldwide availability requirement is a legitimate, nondiscriminatory reason for not hiring plaintiff.

## II.     __SUMMARY JUDGMENT STANDARD__

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  To prevail on summary judgment, the moving party must only show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); See also Fontan v. Potter, 2006 WL 1663548 *7 (D. Puerto Rico).

The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(c); Fontan, 2006 WL 1663548 *7.  "To overcome summary judgment the non-moving party must rebut such a showing by presenting sufficient evidence from which a jury could reasonably find in its favor." De Jesus v. Potter, 211 Fed.Appx. 5, 9 (1st Cir. 2006) (citing Davric Marine Corp. v. Rancourt, 216 F.3d 143, 147 (1st Cir. 2000)). "Even in ... cases where elusive concepts such as motive or intent are at issue, this standard *compels* summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculations."  Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (quoting Medina Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).

III.    **ARGUMENT**

A.    **The Rehabilitation Act Incorporates ADA Standards**

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Iverson v. City Of Boston, 452 F.3d 94, 99 (1st Cir. 2006); 42 U.S.C. § 12101(b)(1).  Pursuant to the ADA, an employer is prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C § 12112(a).  Discrimination encompasses not only "adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." Taylor v. Phoenixville School District, 184 F.3d 296, 306 (3d Cir.1999).  The ADA states that an employer discriminates against an employee when he "does not mak[e] reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship .... " 42 U .S.C. § 12112(b)(5)(A).

In light of the standards imposed by the ADA, it is well-settled that in order to establish a prima facie case of discrimination under the ADA, a plaintiff has the burden of showing: (i) she is a disabled person within the meaning of the ADA; (ii) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (iii) she has suffered an otherwise adverse employment decision as a result of discrimination. Sanchez-Figueroa v. Banco Popular de Puerto Rico, 527 F.3d 209, 213 (1st Cir. 2008); Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002).

4

Here, plaintiff cannot establish a prima facie case because she was not disabled under the ADA. Moreover, even if plaintiff were to make a prima facie case, defendant has shown a legitimate, nondiscriminatory reason for its employment action that is not pretextual.

**B.      Plaintiff Is Not Disabled and Thus Cannot
          Establish A Prima Facie Case of Discrimination**

The aforementioned burden shifting paradigm, established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793-94 (1973), applies here. If plaintiff makes out a prima facie showing of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action. If defendant meets this burden, plaintiff must then offer evidence that the defendant's stated reason for the adverse action was pretextual. Id. at 802-04. To prove pretext, plaintiff must "cast sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication ... or ... allow the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir.1994).

Here, defendant asserts that plaintiff cannot meet the first element of her prima facie case - that she is disabled within the meaning of the ADA. To demonstrate that plaintiff has a disability, she must prove that she: (i) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment. Dean v. Pocono Med. Ctr., 142 F.3d 142, 143 (3d Cir.1998), citing 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g). In making the determination of whether an individual is "disabled," the determination should be made with reference to measures that mitigate the individual's impairment. See Sutton v. United Air Lines,

Inc., 527 U.S. 471 (1999).  In this case, plaintiff is not disabled because her Type I diabetes is controlled by medication.  Id.

The Sutton Court held that "[I]f a person is taking measures to correct for, or mitigate, a physical or mental impairment, the effects of those measures - both positive and negative - must be taken into account when judging whether that person is "substantially limited" in a major life activity and thus "disabled" under the Act .... to be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t] a major life activity."  Id. at 482-83.  The use or nonuse of a corrective device does not determine whether an individual is disabled; that determination depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting.  Id. at 488.

Here, plaintiff cannot demonstrate that there is a genuine issue that she is disabled within the meaning of the ADA.  She cannot provide evidence that when considering her diabetes while on her medication, she is disabled within any of the definitions under the ADA or that she is substantially limited in a major life activity.  In fact, according to plaintiff, she is quite successful in managing her Type I diabetes and has had no problems with her diabetes (Ex. 1, Balogh Declaration p. 1, ¶ 5).  She states, "however with this constant self monitoring, I am able to control my diabetes.  Thus, I am able to perform the essential functions of the State Department Foreign Service Officer Position as long as I continue to self monitor."  Id.  Further, plaintiff had many of her doctors write letters to the Department indicating how plaintiff easily managed her Type I diabetes.  (Ex. 1, Balogh Declaration, p. 1, ¶6).  "My current and former health care providers have written assessments to the US Dept of State, indicating that my condition does not impair me in my ability to carry out the essential functions of the applied for position."  Id.

6

In <u>Sutton</u>, twin sisters were denied employment by a commercial airline company because their uncorrected vision did not meet the company's minimum standard requirement. <u>Sutton</u>, 527 U.S. 471, 479 (1999). The sisters argued that their poor eyesight constituted a disability under the ADA. The Equal Employment Opportunity Commission ("EEOC") has issued regulations to provide guidance regarding the proper interpretation of the term "disability". <u>Id</u>. After restating the definition of disability given in the statute, <u>see</u> 29 CFR § 1630.2(g) (1998), the pertinent EEOC regulations define the three elements of disability: (1) "physical or mental impairment," (2) "substantially limits," and (3) "major life activities." See §§ 1630.2(h)-(j). Under the regulations, a "physical impairment" includes "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." § 1630.2(h)(1). <u>Id</u>. at 480. The term "substantially limits" means, among other things, "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." <u>Id</u>. § 1630.2(j). Finally, "[m]ajor [l]ife [a]ctivities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." <u>Id</u>. § 1630.2(I).

In <u>Sutton</u>, it was held that a disability only exists when it substantially limits a major life activity. <u>Id</u>. at 484. Thus, when the twin sisters wore glasses that corrected their vision, they no

longer were substantially limited.  The Court rejected the plaintiff sisters' argument that

ameliorative measures should not be taken into account by using the following relevant example:

> Under this view, courts would almost certainly find all diabetics to be disabled, because if they failed to monitor their blood sugar levels and administer insulin, they would almost certainly be substantially limited in one or more major life activities. A diabetic whose illness does not impair his or her daily activities would therefore be considered disabled simply because he or she has diabetes. Thus ... would create a system in which persons often must be treated as members of a group of people with similar impairments, rather than as individuals. This is contrary to both the letter and the spirit of the ADA.

 Id.  The Sutton Court precisely used diabetes as an example of cases in which ameliorative

measures would not render all persons disabled simply because they have diabetes particular

condition.  Id.  And, here it is quite clear that plaintiff's management of her diabetes is precisely

the type of individual case in which major life activities are not substantially limited under the

law.

      Further, plaintiff cannot maintain that she was regarded as having a disability.  By its

terms, the ADA allows employers to prefer some physical attributes over others and to establish

physical criteria.  Id. at 490.  An employer runs afoul of the ADA when it makes an employment

decision based on a physical or mental impairment, real or imagined, that is regarded as

substantially limiting a major life activity.  Id.  "Accordingly, an employer ... is free to decide

that some limiting, but not substantially limiting, impairments make individuals less than ideally

suited for a job."  Id.

      Assuming that plaintiff will argue "working" as the major life activity substantially

limited by her diabetes, the argument must fail.  Plaintiff has demonstrated that her diabetes did

not interfere with her work in the past (See Ex. 1, Balogh Dec. p. 2 ¶ 12, p. 3 ¶ 18).  She simply

could not meet the worldwide availability requirement that she be capable of serving at all

Foreign Service Posts.  Type I diabetics must have access to 24-hour emergency care (Ex. 5,

Deposition of Emil von Arx, III, M.D. p. 58 LL. 8-22), which is available in only slightly more than half of all posts (Id. at p. 57 LL. 15-21).

Thus, plaintiff has failed to meet her prima facie case and she cannot prove she is disabled or regarded as disabled within the meaning of the Act.

### C.    The Worldwide Availability Requirement Is A Legitimate, Nondiscriminatory Reason For Not Hiring Plaintiff Because Of Her Type I Diabetes

#### 1.    The Worldwide Availability Requirement

Section 504(a) of the Foreign Service Act of 1980 provides that "[c]areer members of the Service shall be obligated to serve abroad and shall be expected to serve abroad for substantial portions of their careers."  22 U.S.C. §§ 3984(a), 3901(a)(4)("members of the Foreign Service should be * * * available to serve in assignments throughout the world").  The legislative history of these provisions stresses that availability for "worldwide service" is at the core of the Foreign Service.  Local 1812, Am. Fed'n of Gov't Employees v. U.S. Dept. of State, 662 F. Supp. 50, 51 (D.D.C. 1987);  See H.R. Rep. No. 96-992, pt. 2, at 68 (1980)("Section 504(a) sets forth the fundamental criterion for membership in the Foreign Service - availability for worldwide assignment").  Indeed, a central purpose for amending the Foreign Service Act in 1980 was to respond to the "atrophy" of this requirement and the fact that many older Foreign Service Officers were not available for service other than in Europe and Washington, D.C.  As explained by the House Committee on Foreign Affairs:

> [A]vailability for worldwide assignment must be clearly expressed and understood as a basic requirement for admission to the Foreign Service as well as for retention and promotion in the Foreign Service throughout the individual's career.  One of the basic problems giving rise to this new legislation is the atrophy of this fundamental requirement.  More than half of the individuals between ages 50 and 60 who are serving today in the Foreign

9

> Service are not available for worldwide service. The result has
> been a concentration of such individuals in Europe and
> Washington and the inability of the foreign affairs agencies to
> insure adequate staffing of the more difficult posts overseas.

H.R. Rep. No. 96-992, pt. 1. at 9 (1980). See also H.R. Rep. No. 96-992, p 2, at 37

(1980)(same).

The "more difficult" (hardship) posts that are of special concern to Congress share

various characteristics. Among other conditions, endemic health hazards and the lack of local

health care facilities are common to these posts:

> High heat and humidity, a hostile natural environment, unsanitary
> conditions, tropical diseases such as malaria, hepatitis, cholera, and
> meningitis are endemic to many of these posts. Inadequate
> hospitals, a shortage of doctors or nurses, and few flights in and
> out of the capital city, which are necessary in cases of medical
> emergency, combine to present considerable health hazards to
> individuals serving at these posts.

H.R. Rep. No. 96-992, pt. 1, at 7. Owing to these conditions, as found by Congress, individuals

wishing to represent the United States abroad require a willingness to accept obligations

dramatically different from and more extensive than those in the Civil Service. Id. at 3-4.

Acceptance into the Foreign Service requires "acceptance of worldwide assignment" and the

risks attendant with living in hazardous locations. Id. at 4. The State Department makes no

secret of this fact, and applicants to the Foreign Service are notified in advance of hardship posts

and the worldwide availability requirement, as evidences, *inter alia*, by the Department's website

(http://www.careers.state.gov).

## 2.     Defendant's Legitimate Nondiscriminatory Reason for Not Hiring Plaintiff

Even if the Court finds that plaintiff established a prima facie case of discrimination,

there is a legitimate, nondiscriminatory reason for defendant's employment action. It is

undisputed that the State Department has consistently required, as a precondition for employment in the Foreign Service, that all applicants demonstrate either that they are medically fit to serve at 100% of Foreign Service posts worldwide (hereinafter "worldwide availability") or that they have some unique or special skill that would justify a waiver of that requirement. (Ex. 2, Depo. of Teddy B. Taylor, p. 22 LL. 1-4; Ex. 4, Depo. of Bruce Cole, p. 35 LL. 18-24, p. 36 LL. 1-6).

Moreover, plaintiff does not dispute that the State Department denied plaintiff employment based on its determination that plaintiff was not worldwide available and did not possess any special or unique skill that would justify a waiver of the criterion. Similarly, every contemporaneous record and document establishes that the overriding need for Foreign Service candidates that are worldwide available drove the State Department's hiring decisions in general and, specifically, the State Department's conclusion that it could not accept plaintiff into the Foreign Service in 2003. The State Department's hiring decisions hinged, in relevant part, on whether a candidate was available for worldwide posting at each and every foreign post. (Ex. 2, Depo. of Taylor, p. 22). Plaintiff's failure to satisfy this requirement plainly provides a legitimate, nondiscriminatory justification for the agency's decision.

3. **The Worldwide Availability Criterion**
   **Is Permissible Under The Rehabilitation Act**

The agency's use of the worldwide available criterion in hiring decisions is also permissible under the Rehabilitation Act. The worldwide available criterion operates as a "qualification standard, . . . or other selection criteria" which is "job-related" and "consistent with business necessity," and therefore explicitly permitted under 42 U.S.C. § 12113(a), because it provides the means by which the Foreign Service is able to achieve compliance with its

statutory obligation to maintain a workforce that is "available to serve in assignments throughout the world."  22 U.S.C. § 3901(a)(4).

As its name alone reveals, the Foreign Service is in the business of staffing foreign posts. The agency used the worldwide available criterion in 2003, as it had since 1980 and as it continues to do today, to select candidates for employment which "serve[d], in a significant way, the legitimate" and Congressionally-mandated goal that the Foreign Service maintain a foreign based, rather than domestic, workforce.  Wards Cove Packing Co., Inc. v. Atonio, 490 U.S. 642 (1989); see also Foreign Service Act of 1980, S. Rep. 96-913, 1980 U.S.C.C.A.N. 4419, 4432 (1980) ("The [Foreign Service Act of 1980] eliminates the anomalous 'domestic' foreign service category which has in the past weakened severely the requirement of availability for worldwide service").  Without members initially being available for assignment at 100% of its foreign posts, the Foreign Service could not effectively carry out its principal function, which is to represent the interests of the United States in foreign countries located throughout the world.  Because of the central importance of a worldwide available workforce, the State Department waives that requirement only if the candidate presents an essential skill that would satisfy a need that would otherwise be unfulfilled (Ex. 4, Depo. of Bruce Cole, p. 35, LL. 18-24).  Because the worldwide available selection criterion is "job related" and "consistent with business necessity," see 42 U.S.C. § 12113(a), the State Department's use of the criterion in deciding whether to hire candidates for the Foreign Service is a permissible means of achieving a worldwide available workforce even if worldwide availability were not deemed to be an "essential function" of any specific Foreign Service Officer when considered on an individualized basis.

As the facts establish, plaintiff did not and could not satisfy the worldwide availability criterion because of her Type 1 diabetes.  Based upon established medical protocols, the

Department of State's Office of Medical Services believed that plaintiff should be checked every three months, ideally by a diabetologist (Ex. 5, von Arx, p. 29, LL. 8-12). Such medical follow-up would include an examination for blood sugar, and Hemoglobin A1c determinations (Id. at LL. 11-12). Further, with Type I diabetes, plaintiff requires access to a 24-hour emergency facility that can deal with diabetic emergencies, including hypoglycemia[3] shock and ketoacidosis[4] (Id. at p. 37 LL. 13-16). Such emergency facilities are not available world-wide (Id.). Because this condition posed a significant risk of severe harm, and even death, for untreated or improperly treated diabetic complications, the State Department did not consider plaintiff available for postings worldwide. Thus, because plaintiff could not safely be assigned at foreign posts lacking emergency room access to treat any medical complications due to diabetes, plaintiff could not satisfy the agency's 100% worldwide available criterion and was therefore denied entry into the Foreign Service.

### 4. A Waiver Of The Worldwide Availability Requirement Would Not Be A Reasonable Accommodation Because It Is An Essential Function Of The Job

The ADA does not require "an employer to relieve the employee of any essential functions of the job, modify the actual duties, or reassign existing employees, or hire new employees to perform these duties." Robertson. v. The Neuromedical-Center, 161 F.3d 292, 295 (5th Cir. 1998); see also 29 C.F.R. Pt. 1630, App.(Background) ("While the ADA focuses on eradicating barriers, the ADA does not relieve a disabled employee or applicant from the obligation to perform the essential functions of the job"). In this case, as demonstrated above,

---

[3] "An abnormally diminished concentration of glucose in the blood, which may lead to tremulousness, cold sweat, piloerection, hypothermia, and headache; when chronic and severe it may cause central nervous system manifestations that in rare cases can be fatal." Dorland's Illustrated Medical Dictionary, 915 (31st ed. 2007)

[4] "Acidosis accompanied by the accumulation of ketone bodies (ketosis) in the body tissues and fluids, as in diabetic acidosis and starvation acidosis." Id. at 997

world-wide availability is unquestionably an essential function of the Foreign Service.  See 29

C.F.R. § 1630(n)(1) ("essential functions" mean the "fundamental duties of the employment

position the individual with a disability holds or desires," as opposed to "marginal functions").

Indeed, Congress itself has determined that worldwide availability is an essential function

of a Foreign Service Officer. See 22 U.S.C. § 3901(a)(4) ("the members of the Foreign Service

should be ... available to serve in assignments throughout the world").  The legislative history of

this provision emphasizes that "availability for worldwide assignment must be clearly expressed

and understood *as a basic requirement for admission to the Foreign Service* as well as for

retention and promotion in the Foreign Service throughout the individual's career." H.R. Rept.

96-992, Part 1, at 9 (emphasis supplied); see also H.R. Rept. 96-992, pt 2, at 68 (1980) ("Section

504(a) sets forth the *fundamental criterion* for membership in the Foreign Service – availability

for worldwide assignment")(emphasis supplied).

Congress further made clear that any exceptions to the worldwide availability

requirement must take into account the Service's overall staffing needs. See Rept. 96-992, Part 1,

at 7 (although "absolute and universal insistence on 'worldwide availability'" is not required, it

must be defined in a manner to provide for "effective staffing patterns overseas," and exceptions

to worldwide availability cannot be made "without regard to the agency's overall staffing

needs").  Consistent with this congressional intent, Foreign Service Officers who become

unavailable for worldwide service are not required to leave the Service but are, instead, assigned

to posts abroad that can provide for their medical needs.  See Barth v. Gelb, 2 F.3d 1180, 1189

(D.C. Cir. 1993)(rejecting the argument that an agency's medical accommodation of current

employees requires it to extend the same accommodation to applicants, explaining, *inter alia*,

that "[a] willingness to accommodate incumbent employees increases the likelihood that they – and their knowhow – will be retained by the employing agency").

In regard to applicants, the only instance in which the worldwide availability requirement can be waived is when the Service has a compelling need for special skills that outweighs the fact that the candidate will be limited from the very beginning of his or her career in the number of posts to which he or she can be assigned. See 29 C.F.R. § 11.1(e)(5). Such waivers are increasingly rare, as noted earlier, and individuals who are admitted into the Foreign Service pursuant to such waivers represent only a very small fraction of Foreign Service members (Ex. 2, Taylor Depo., p. 32). Consistent with this practice and policy, plaintiff's request for a waiver of the world-wide availability requirement was denied because she could not demonstrate any special skills that might outweigh her unavailability for world-wide assignment.

Because the worldwide availability requirement is an essential function of the Foreign Service, plaintiff is not entitled under the ADA to be relieved of this requirement as a reasonable accommodation. Robertson, 161 F.3d at 295. Unquestionably, if this were to happen, other Foreign Service Officers would have to incur additional hazardous post assignments on plaintiff's behalf, which is also not required under the ADA. Id. This result would be inherently unfair and would have a negative impact on morale. Id.; see Barth v. Gelb, 2 F.3d at 1189-90 (employees' morale can be considered when determining whether a proposed accommodation is reasonable). It also would be is fundamentally at odds with the ADA's purposes. See 29 C.F.R. Pt. 1630, App. (Background) ("the ADA is intended to enable disabled persons to compete in the workplace based on the same performance standards and requirements that employees expect of persons who are not disabled").

Lastly, for all of the above reasons, a waiver of the worldwide availability requirement on plaintiff's behalf would be contrary to one of Congress' express purposes for enacting the Foreign Service Act of 1980.  See H.R. Rept. 96-992, pt. 1 at 9 ("One of the basic problems giving rise to this new legislation is the atrophy of this fundamental requirement [the worldwide availability requirement]").  The ADA (and, in turn, the Rehabilitation Act) do not require frustration of this congressional intent. See Southeastern Community College v. Davis, 442 U.S. 397, 410 (1979) (an employer is not required to fundamentally alter its program).  Nor, as demonstrated above, does the ADA relieve plaintiff of having to perform the essential functions of the job he seeks, or impose on other employees the burden of performing such functions on plaintiff's behalf. Robertson, 161 F.3d at 295.

> **5.**     **The Foreign Service's Use Of The 100% Worldwide Available Selection Criterion Is A Permissible Means Of Achieving Compliance With Its Statutory Obligation To Maintain A Workforce That Is Worldwide Available.**

As demonstrated above, the Foreign Service decided not to hire plaintiff because she was not worldwide available and lacked special skills that would justify a waiver of that criterion. These considerations, by themselves, adequately satisfy the Foreign Service's obligation under McDonnell Douglas to provide a "legitimate, non-discriminatory reason" for its decision not to hire plaintiff.  See Raytheon, 540 U.S. at 53-55.  Where, as here, a party has brought a discriminatory treatment claim and has not alleged that the underlying employment policy has a discriminatory impact, the employer need not establish that a legitimate, non-discriminatory reason for an employment decision is justified by business necessity.  Raytheon Co. v. Hernandez, 540 U.S. 44, 54-55 (2003); see also Chalk v. Dep't of Labor, 565 F.2d 764, 767 (D.C. Cir. 1977) ("It is not necessary to show a 'legitimate business necessity' for not hiring the

appellant, as he argues; rather, the defendant need only 'articulate some legitimate,

nondiscriminatory reason' for not doing so.").

      Defendant addresses the validity of these standards here not because it is obliged to do so

under <u>McDonnell Douglas</u>, but instead to establish that it is permissible under the Rehabilitation

Act for the Foreign Service to rely on a threshold candidate qualification standard, such as the

worldwide available selection criterion, as a means of achieving and maintaining a workforce

that satisfies the worldwide staffing needs of the Department.  Because this selection criterion is

"job related" and "consistent with business necessity," 42 U.S.C. § 12113(a), it is permissible for

the Department to rely upon it in making Foreign Service hiring decisions even if it were

determined that it "screen[s] out or tend[s] to screen out or otherwise deny a job or benefit to an

individual with a disability."  <u>Id</u>.  Consequently, it is unnecessary for this Court to resolve any

disputed issues of fact that may exist regarding the precise percentage of Foreign Service

Officer[s] that ultimately needs to be worldwide available to assess the validity of the 100%

selection criterion.

      The "dispositive issue" under the business necessity standard is "whether a challenged

practice serves, in a significant way, the legitimate employment goals of the employer."  <u>Wards</u>

<u>Cove,</u> 490 U.S. at 659 (citations omitted).  The touchstone of this inquiry is a reasoned review of

the employer's justification for his use of the challenged practice.  A mere insubstantial

justification in this regard will not suffice, because such a low standard of review would permit

discrimination to be practiced through the use of spurious, seemingly neutral employment

practices.  At the same time, though, there is no requirement that the challenged practice be

'essential' or 'indispensable' to the employer's business for it to pass muster: this degree of

scrutiny would always be impossible for most employers to meet, and would result in a host of

evils[.]  Id.; see also Dothard v. Rawlinson, 433 U.S. 321, 331 n. 14 (1977); Smith v. City of Des

Moines, 99 F.3d 1466, 1471 (8th Cir. 1996) (to establish that a standard is consistent with

business necessity, the standard must be "necessary to safe and effective job performance");

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1119 (11th Cir. 1993) ("Measures demonstrably

necessary to meeting the goal of ensuring worker safety are therefore deemed to be 'required by

business necessity'"); EEOC v. Exxon, 203 F.3d 871, 874 (9th Cir. 2000) (same).  When the

employer meets this burden, "it remains open to the complaining party to show that other tests or

selection devices, without a similarly undesirable [discriminatory] effect, would also serve the

employer's legitimate interest [in serving legitimate employment goals]."  Albemarle Paper Co.

v. Moody, 422 U.S. 405, 425 (1975).

        Pursuant to these standards, the 100% worldwide available criterion and the Foreign

Service's policies unquestionably serve "in a significant way" the Foreign Service's ability to

satisfy its mandatory statutory obligation to maintain an aggregate workforce that is "available to

serve in assignments throughout the world," 22 U.S.C. § 3901(a)(4), and to insure adequate

staffing of the hardship posts overseas -- many of which are limited in medical capabilities.

        The requirement that incoming Foreign Service Officer candidates be available for

posting at all foreign posts is critical to the agency's ability to provide adequate staff at each

foreign post throughout the world.  The Foreign Service is able to ensure that all foreign posts,

including hardship posts with limited or non-existent medical care facilities, are adequately

staffed by imposing an entry level requirement that Foreign Service Officer candidates be

available for assignment to 100% of foreign posts.  This entry level qualification requirement is

critical to ensure the worldwide availability of the overall workforce of the Foreign Service

because as Foreign Service Officers increase in time-in-service, grade and correspondingly age,

an increasing proportion of them become less worldwide available.  (Ex. 6, Declaration of Philippe A. Lussier at ¶ 5).  In that regard, Foreign Service employment data reflects that, on average, only approximately 85 percent of the overall Foreign Service Generalist workforce is worldwide available at any given time even though virtually all incoming Foreign Service Officers are worldwide available (a small number of candidates receive a waiver) (Ex. 6, Lussier Declaration at ¶3).  The approximately 15% of the workforce that is not worldwide available at any given time is heavily skewed toward the more senior officers: historical data reflects that senior grades with  20 or more years in service have a 25% proportion that is not worldwide available, while junior grades with fewer than a couple years in service have a 4% proportion that is not worldwide available.  (Ex. 6, Lussier Declaration at ¶ 4).  With an average of 27 years-in-service before a Foreign Service officer reaches the most senior rank, requiring incoming officers to be worldwide available serves to ensure that the aggregate workforce remains worldwide available with time.  Id.

Other factors further limit the ability of individual officers to serve worldwide at a given time, including, for example, special care requirements for spouses, elderly parents, and/or children.  Personal needs of Foreign Service Officers such as the employment needs of a spouse or the impact of divorce on a Foreign Service family may also limit their worldwide availability.  See 22 U.S.C. § 3901(b)(5) (Foreign Service directed to "minimiz[e] the impact of the hardships, disruptions, and other unusual conditions of service abroad upon the members of the Foreign Service, and mitigat[e] the special impact of such conditions upon their families").  The Foreign Service is able to meet its personnel needs by imposing its neutral and generally-applicable policy that its candidates be 100% worldwide available or possess some special skill justifying waiver of the rule.

Even with its worldwide available selection criterion, the Foreign Service was, at the time of plaintiff's application for employment, already overburdened in its ability to adequately and effectively staff its posts worldwide.  Even with the requirement of entrants being 100% worldwide available, the most recent Government Accounting Office study reflects that 9.4% of the Department of State's positions in hardship posts are vacant.   (Ex. 6, Lussier Declaration at ¶ 6).  It is not surprising therefore that hiring candidates who are not worldwide available could effectively undermine the Foreign Service's ability to provide adequate staff for all its foreign posts.  Those candidates who cannot obtain a Class 1 clearance (i.e., those with medical conditions that cannot be treated at all posts worldwide) would, by definition, be unable to serve at the substantial number of posts with inadequate healthcare systems for the treatment of their medical conditions.  Consequently, without a worldwide availability requirement, it would be significantly more difficult for the Foreign Service to staff its large number of posts that lack adequate healthcare systems.

If the Foreign Service were to admit candidates who are not worldwide available, this would place additional burdens upon those officers who are worldwide available running the risk of creating a two-tier Foreign Service divided between those who can serve at hardship posts and those who cannot.  This would have a significant detrimental effect on morale and would likely limit the State Department's ability to recruit and retain employees who are medically able to serve at the hardship posts.  This problem is even more acute because in recent years, the percentage of positions that are at hardship posts has increased.  (Ex. 6, Lussier Declaration at ¶ 7).  Currently, 53.9 % of Foreign Service Officer generalist positions are at hardship posts.  Id. Therefore, without question, elimination of the 100% worldwide available criterion would hinder the Foreign Service's ability to perform its functions abroad.

6.    **Plaintiff's Medical Condition Poses A Direct Threat
And Is, Therefore, A Legitimate Reason To Deny Employment**

In addition to worldwide availability being consistent with business necessity and an essential function, the exclusion of plaintiff from the Foreign Service because of her Type 1 diabetes is lawful under the ADA because her medical condition poses a direct threat.  As explained above, in a significant number of Foreign Service posts, there is a high prevalence of diseases that would make managing her glucose level extremely difficult even for trained physicians.  At many of these posts, there will not be adequate medical care or emergency room medical care.  As a result, if plaintiff were to contract one of these diseases in a post without adequate medical care, the complications very well could be fatal.  Therefore, plaintiff would be a direct threat to herself if she were allowed to serve at these posts.  In addition, if emergency medical evacuation were even feasible, plaintiff would also be a direct threat to other people who would need to assist her in the evacuation from war zone posts, including Iraq and Afghanistan.

While the ADA prohibits various screening devices an employee might otherwise use to insure the safety of employee and the workplace, the ADA recognizes a "direct threat" defense as a qualification standard:

> The term 'qualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace.

42 U.S.C. § 12113(b).  The ADA defines direct threat as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation."  42 U.S.C. § 12111(3).  The EEOC goes even further and expands the direct threat exception to the individual.  The pertinent EEOC regulations state:

> Direct Threat means a significant risk of substantial harm to the health or safety of *the individual or others* that cannot be eliminated or reduced by reasonable accommodation.

21

29 C.F. R. § 1630.2(r)(emphasis added);  see E.E.O.C. v. E.I. Du Pont De Nemours & Co., 480

F.2d 724, 731 (5th Cir. 2007); Sista v. CDC IXIS North American, Inc., 445 F.3d 161, 170 (2d

Cir. 2006); see also Lovejoy-Wilson v. Noco Motor Fuel, Inc., 263 F.3d 208, 219, 220 (2d Cir.

2001) (observing that EEOC expanded on the direct threat language in its regulations.)

In Chevron USA, Inc. v. Echazabal, 536 U.S. 73 (2002), the Supreme Court considered

the EEOC's expanded definition of the direct threat defense and whether an employer may raise

the defense in situations where the work environment poses a threat to the plaintiff himself.

Chevron refused to hire plaintiff since he suffered from Hepatitis C, which Chevron's doctors

opined would be aggravated by exposure to toxins in the work environment.  Relying principally

upon the language of the ADA, the Court upheld the EEOC's regulation.  The Court noted that

the ADA requires qualification standards to be "job-related and consistent with business

necessity," 42 U.S.C. § 12113(a), and observed that these are "spacious defensive categories,

which seem to give an agency . . . a good deal of discretion in setting the limits of permissible

qualification standards," Id. at 80, and, further, that the ADA states the qualification standards

"may include" a requirement that the individual not pose a direct threat to others.  Given this

broad language, the Court found the EEOC's regulation reasonable.

In applying the direct threat defense, the court should first determine whether the

defendant "has demonstrated that the employee cannot perform the job without a significant risk

of harm," Nunes v. Wal-Mart Stores, Inc., 164 F.3d 1243, 1248 (9th Cir. 1999), to the plaintiff or

to others.  If that proof has been made, then the next inquiry is whether the "employer can make

a reasonable accommodation, without undue hardship to the employer, so that the employee can

perform her job without such risk." Id.  In this case, plaintiff's medical condition makes her a

direct threat to herself and others because of the conditions at a significant number of posts and

the inadequate medical care. There are no reasonable accommodations that can be given that would allow plaintiff to go to these posts without posing this threat.

Finally, the assessment of direct threat must be an individualized assessment based upon medical or other evidence available at the time of the refusal to accommodate. See Chevron USA, Inc. v. Echazabal, 536 U.S. at 86 ("particularized inquiry into the harms the employee would probably face"); Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 569 (1999)(direct threat criterion requires "'an individualized assessment of the individual's present ability to safely perform the essential functions of the job based on medical or other objective evidence."); Bragdon v. Abbott, 524 U.S. 624, 649 (1998); Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d at 220 (use of medical evidence protects disabled persons from prejudices and stereotypes). The factors to consider include the duration of the risk; the nature and severity of the potential harm; the likelihood that the potential harm will occur; and the imminence of the harm. 29 C.F.R. § 1630.2(r); E.E.O.C. v. Wal-Mart Store, Inc., 477 F.3d 561, 571 (8th Cir. 2007). When evaluating such a risk of harm to a prospective employee, the employer must act upon "reasoned and medically sound judgments." Knapp v. Northwestern Univ., 101 F.3d at 473, 486 (7th Cir. 1996); compare Welsh v. City of Tulsa, Okl., 977 F.2d 1415, 1420 (10th Cir. 1992) (noting that even "an error in [medical] judgment as to an individual's particularized capabilities is not discrimination").

The State Department has met these criteria. The State Department's Office of Medical Services conducted an individualized review of plaintiff's medical condition and compared it to the conditions at the posts, including the medical care available. The Office of Medical Services concluded that plaintiff could not be posted to a significant number of posts because there was a strong likelihood that she would experience serious medical complications as a result of her

diabetes and endemic diseases (Ex. 3, Depo. of Dr. Yun, pp. 67-69).  As Dr. Thomas Yun, Director of the Office of Medical Services, testified, the medical personnel conducted an assessment and determined that plaintiff could not manage these complications by herself or others and that these complications could be fatal (Id. at p. 38, LL. 2-8, 19-22; Ex. 5 Depo. of von Arx, p. 29, LL. 1-2).

Thus, the Foreign Service's generally-applicable hiring policies are hardly the type of "artificial, arbitrary, and unnecessary barriers to employment" that Congress sought to eliminate through the Rehabilitation Act.  Griggs, 401 U.S. at 431.  To the contrary, the worldwide availability requirement clearly "serves, in a significant way, the legitimate employment goals of the employer."  Wards Cove, 490 U.S. at 659.  Because the selection criteria used by the Foreign Service are job related and consistent with business necessity, the State Department's application of those policies in making hiring decisions is permissible under the Rehabilitation Act even if they screen out or tend to screen an individual with a disability such as plaintiff here. In addition, the Plaintiff's condition, Type 1 diabetes, is very difficult to control under the extreme circumstances found at some posts overseas and, therefore, she poses a direct threat to herself and others.  As a result, the State Department implemented lawful selection criteria when it denied plaintiff employment and did not violate the Rehabilitation Act.

IV.  **CONCLUSION**

WHEREFORE, for the foregoing reasons, the Court should grant summary judgment for the defendant.

Respectfully, submitted,

HILLARY RODHAM CLINTON
In her capacity as Secretary of State
of the United States of America
Respectfully submitted,

MICHAEL K. LOUCKS
ACTING UNITED STATES ATTORNEY

By:  /s/ Rayford Farquhar
     Rayford Farquhar
     Assistant US Attorney
     U.S. Attorney's Office
     1 Courthouse Way, Suite 9200
     Boston, MA 02110
     617-748-3284

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on October 28, 2009.

/s/ Rayford Farquhar
Rayford Farquhar
Assistant US Attorney