**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

_____
)
ANNA BALOGH,                                         )
)
        Plaintiff,                                )
)
   v.                                                 )
)    C.A. No. 07–11086-RBC
HILLARY CLINTON, in her official            )
capacity as Secretary of State of the       )
United States of America, and the        )
UNITED STATES OF AMERICA,                 )
)
       Defendants.                             )
_____ )

**PLAINTIFF ANNA BALOGH'S OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

In moving for summary judgment, Defendants reveal misunderstanding of both

disability discrimination law and the issues which may be disposed of as a matter of law,

as opposed to by a fact-finder.  Most significantly, Defendants' explanation of the

standard for proving disability discrimination under the Rehabilitation Act is simply

incorrect.  In a case such as this one, the question is not whether the employer had a

discriminatory motive in making its employment decision, but whether the challenged

practice in fact resulted in discrimination based on the plaintiff's disability.  As such, it is

absurd for Defendants to suggest that the State Department's policy banning all insulin-

dependent diabetics from serving in the Foreign Service solely because of their diabetes

is a legitimate, non-discriminatory reason to deny Plaintiff admission into the Foreign

Service.  Regardless of whether Defendants have instituted and applied this policy with

any evil motive, of course the policy is discriminatory—Anna Balogh was denied

appointment solely because of her diabetes.

1

Additionally, in its effort to justify the State Department's blanket ban, Defendants raise myriad arguments as to why the ban is legitimate and why reasonable accommodation would not be possible.  However, despite the fact that courts could not be more clear that an individualized fact-specific inquiry is required in analyzing such defenses to a disability discrimination claim, Defendants have not come up with any evidence in their favor that is specific to Balogh.  Instead, they rely solely on generalized statements about diabetes treatment and the worldwide availability requirement, none of which are relevant to the issue of whether Balogh is capable of performing the essential functions of the Foreign Service Officer position with or without reasonable accommodation.[1]  Balogh's ability to perform the job and the reasonableness of any accommodations are quintessential fact questions, which must go to a jury, especially on such a scant factual record as the one presented by Defendants on summary judgment here.  Accordingly, Defendants' summary judgment motion should be denied in its entirety.

## ARGUMENT

## I.    DEFENDANTS HAVE MISSTATED THE STANDARD FOR EVALUATING PLAINTIFF'S DISABILITY DISCRIMINATION CLAIM.

Balogh challenges the State Department's policy prohibiting all insulin-dependent (Type I) diabetics from serving in the Foreign Service.  This policy is undisputed. Defendants acknowledge both that "[t]he worldwide availability requirement is a requirement for all persons hired as members of the Foreign Service," (Def. Fact Stmt. ¶ 6), and that the State Department specifically prevents Type I diabetics from satisfying

---

[1]    Moreover, as explained in the attached affidavit of Dr. Daniel Lorber, many of Defendants' statements about diabetes are simply incorrect.  (See Affidavit of Dr. Daniel Lorber, attached to Pl.'s Fact Stmt. as "Exhibit 10").

that worldwide availability requirement.  (See Pl.'s Fact Stmt. ¶¶ 39-50, Docket No. 51).

In light of this undisputed evidence, it must be deemed admitted that Defendants have

discriminated against Balogh because of her diabetes.  Though Defendants argue that

the State Department's adherence to the worldwide availability requirement constitutes a

"legitimate, *nondiscriminatory* reason for [their] employment action," (Def. Br. at 10)

(emphasis added), that argument misunderstands what it means for a policy to be

discriminatory.  Of course the policy is discriminatory: Balogh was denied appointment for

no reason other than her diabetes.  Accordingly, despite some rhetorical confusion in

Defendants' brief, Defendants cannot dispute that the reason for its challenged adverse

action is Balogh's diabetes.

　　　　To prevail on her claim for disability discrimination, Balogh must prove three

elements:  "(i) that he is disabled within the meaning of the ADA; (ii) that he is able to

perform the essential functions of his job, with or without reasonable accommodation; and

(iii) that the adverse employment decision was based in whole or in part on his disability."

Martinez-Jordan v. Baxter Healthcare Corp., 608 F. Supp. 2d 224, 241 (D.P.R. 2009).

Defendants argue that the Court must employ the McDonnell Douglas burden-shifting

analysis to determine the third element.  However, where, as here, there is no dispute as

to whether the plaintiff's disability was the reason for the adverse employment action,

McDonnell Douglas does not apply.[2]  Simply put, Defendants admit that all applicants to

---

[2]　　　　The reason that motive is irrelevant in a case such as this is because defendants are rarely
"malicious" in their evaluations of whether disabled persons are able to perform the essential functions of
their job with or without reasonable accommodation.  Instead, the courts have recognized that such
discrimination is typically committed by "well intentioned" but mistaken decision makers who rest their
conclusions on inaccurate stereotypes and unsubstantiated assumptions about an individual's disability
often coming from their own retained physicians.  Indeed, disability discrimination cases often arise from
an employer "benevolently protecting the employee" from his own condition and limitations.  See, e.g.,
Tyler v. City of Manhattan, 118 F.3d 1400, 1407 (10th Cir. 1997) ("[I]n enacting the ADA, Congress
recognized that discrimination against the disabled is often the product of indifference rather than

the Foreign Service must obtain worldwide medical clearance, and admit further that

individuals with Type I diabetes cannot obtain such clearance as a matter of policy.

Indeed, Defendants also admit that Balogh was denied employment with the Foreign

Service because of this policy.  Because the undisputed reason for the challenged action

in this case was Balogh's diabetes, there is no need to "smoke out" Defendants' true

reason for refusing to hire her.  Thus the McDonnell Douglas test is irrelevant.[3]

        Several federal appellate courts have explicitly rejected application of the

McDonnell Douglas analysis in cases where there was no dispute that the plaintiff's

disability was the reason for the challenged action or policy (without regard to whether the

defendant had any evil motive).  First, in Pushkin v. Regents of University of Colorado,

the Tenth Circuit refused to apply the McDonnell Douglas test to an individual's challenge

under the Rehabilitation Act to the denial of his admittance to a psychiatric residency

program because he suffered from multiple sclerosis.  658 F.2d 1372, 1385 (10th Cir.

1981).  As the court there explained:

> It would be a rare case indeed in which a hostile discriminatory purpose or
> subjective intent to discriminate solely on the basis of handicap could be shown.
> Discrimination on the basis of handicap usually results from more invidious
> causative elements and often occurs under the guise of extending a helping hand
> or a mistaken, restrictive belief as to the limitations of handicapped persons.

Id.  Courts in the Sixth and Fourth Circuits have made similar holdings.  In Monette v.

Electronic Data Systems Corp., the Sixth Circuit has ruled that, in cases in which the

---

animosity"); Aero Testing & Balancing Systems, Inc., 541 N.E. 2d 1229, 1235 (Ill. App. 1 Dist. 1989)
(disability discrimination "rarely results from a hostile purpose or intent to discriminate and often occurs
under . . . restrictive beliefs as to the limitations of handicapped persons"), citing Pushkin v. Regents of
the University of Colorado, 658 F.2d 1372, 1385 (10th Cir. 1981).

[3]    Put another way, there is no need to employ the McDonnell Douglas analysis in a case such as
this because the challenged action is per se discriminatory (i.e., the action was taken solely because of
the plaintiff's disability).  As such, the defendant could not satisfy the second part of the McDonnell
Douglas test because it could not prove that the reason for the action was non-discriminatory.

employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision, "[t]he McDonnell Douglas burden shifting approach is unnecessary because the issue of the employer's intent . . . has been admitted by the defendant." 90 F.3d 1173, 1182 (6th Cir. 1996). The court in Benson v. EI Dupont Company likewise explained that, "[i]n cases in which the employer does not disclaim reliance on the disability, the purpose of the McDonnell Douglas test, determining the reason for the adverse employment action, will have been achieved at the outset" and that test is therefore inapplicable. 182 F. Supp. 2d 527, 531 (W.D. Va. 2002), citing, inter alia, Tyndall v. National Educ. Ctrs., 31 F.3d 209, 212 (4th Cir. 1994)).

In a case tried in this District in which the plaintiff was prevented from joining the Boston Police Department because of a hearing impairment, Judge Woodlock explained in his instructions to the jury: "this isn't a case in which you are concerned about the process that was used by the defendant to reach its conclusion that the plaintiff was not qualified."[4] Richard Dahill v. Boston Police Department, C.A. 98-11441-DPW (D. Mass. 2002), jury instructions, attached as "Exhibit A" at 2-3. In Dahill, as in this case, the adverse action was admittedly taken because of the plaintiff's disability (there a hearing impairment, here diabetes), so the defendant's underlying motive was irrelevant.

Notably, in addition to holding that discriminatory animus is irrelevant where the challenged action was admittedly done because of the plaintiff's disability, courts have held that claims for reasonable accommodation—such as the claimed presented here— are not to be analyzed under the McDonnell Douglas framework. Indeed, the First Circuit has repeatedly made clear that claims of failure to provide reasonable accommodation

---

[4]    The federal jury in Dahill ultimately found that the plaintiff was capable of performing the duties of a police officer and awarded him one million dollars in damages.

require no showing of discriminatory intent.  In Higgins v. New Balance Athletic Shoe, Inc., the plaintiff brought suit alleging failure to accommodate her hearing disability in violation of the ADA.  194 F.3d 252, 263 (1st Cir. 1999).  The district court granted summary judgment for the defendant, finding that the plaintiff had failed to adduce any evidence of discriminatory motive by the defendant.  Id.  The First Circuit reversed that order, however, explaining that the "McDonnell Douglas scheme is inapposite" with respect to claims for failure to accommodate, since an "employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent . . . "  Id. at 264; see also Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008) ("[A] showing of discriminatory intent or animus is not required in cases alleging a failure to accommodate"); Crevier v. Town of Spencer, 600 F. Supp. 2d 242, 253 (D. Mass. 2008) ("[T]he three-part McDonnell Douglas burden-shifting scheme usually employed in summary judgment discrimination analysis is 'inapposite' for . . . claims" of failure to accommodate).

Though there can be no question that Balogh was denied admission to the Foreign Service solely because of her diabetes, Defendants attempt to obscure this fact by arguing that "the Foreign Service decided not to hire plaintiff because she was not worldwide available . . ." (Def. Br. at 16).  In fact, as discussed in more detail in Section III, infra, Defendants have proffered no evidence that Balogh specifically is not worldwide available and, in fact, Balogh takes the position that she is worldwide available.  Thus, based on the above, if this Court determines either that Balogh has a disability as a matter of law or that there is a triable issue of fact as to whether she suffers from a disability (including having a record of or being perceived as having such a disability),

6

then the only question is whether Balogh is capable of performing the essential functions of the job, with or without reasonable accommodation.  That is a fact question that must go to the jury.

## II.    AS A MATTER OF LAW, PLAINTIFF'S DIABETES QUALIFIES AS A DISABILITY UNDER THE REHABILITATION ACT.

As explained in her motion for summary judgment, Balogh is entitled to summary judgment on the issue of her diabetes being a disability, because the undisputed evidence in the record demonstrates that her diabetes constitutes a substantial limitation on the major life activities of eating, seeing, and reproducing.  Balogh will not repeat here the arguments set forth in her motion but incorporates those arguments into this brief by reference.

Notably, in arguing that they are entitled to summary judgment on the issue of whether Balogh has a disability, the only case Defendants cite in support of their argument is Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999), a case which did not concern diabetes and contains only a passing reference that, by considering ameliorative measures in determining whether an individual is disabled, the Court prevented a situation in which "courts would almost certainly find *all* diabetics to be disabled."  Id. at 483 (emphasis added).  It is quite a leap to take this general statement that not all diabetics should be considered disabled to stand for the proposition that, on the record here, Balogh's particular diabetic condition does not constitute a substantial limitation on a major life activity *as a matter of law*.  Indeed, to interpret Sutton in that way would be to ignore the Supreme Court's repeated assertions that courts must conduct individualized inquiries to determine whether an individual's impairment constitutes a disability.  See, e.g., id. at 483 ("whether a person has a disability under the ADA is an individualized

7

inquiry."); see also Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 20 (1st Cir. 2004)

("It is well established that the determination of whether a plaintiff has a disability must be

made on a case-by-case basis."). As the court correctly observed in Miller v. Verizon

Commc'ns, Inc., "[o]f course, while 'diabetic status, per se, does not qualify a plaintiff as

disabled under the ADA,' a diabetic whose condition substantially limits the major life

activity of 'eating' may so qualify." 474 F. Supp. 2d 187, 197 (D. Mass. 2007).[5]

Defendants have wholly ignored the numerous cases in which federal courts have

held that summary judgment for defendants was not warranted on the issue of whether

diabetes is a disability. See, e.g., Miller v. Verizon Comm'ns, Inc., 474 F.Supp.2d 187,

197 (D. Mass. 2007) (denied summary judgment to defendant on issue of whether

plaintiff's diabetes was substantial limitation on major life activity of eating); Rohr v. Salt

River Project Agricultural Imp. & Power Dist., 555 F.3d 850, 859-60 (9th Cir. 2009)

(reversing district court's award of summary judgment to employer on the plaintiff's

diabetes being a disability); Branham v. Snow, 392 F.3d 896, 903 (7th Cir. 2004) (same);

Fraser v. Goodale, 342 F.3d 1032, 1041 (9th Cir. 2003) (same); Lawson v. CSX Transp.,

Inc., 245 F.3d 916, 924 (7th Cir. 2001) (same); Countryman v. Nordstrom, Inc., 2007 WL

38912, at *5 (D. Minn. 2007) (same); Downs v. AOL Time Warner, Inc., 2006 WL 162563,

at *6 (S.D. Ohio 2006) (same).

---

[5]    As Plaintiff has explained in prior briefing, the Supreme Court's decision in Sutton has been
overruled by Congress' enactment of the ADA Amendments Act, effective January 2010. While this Court
has declined to apply this amendment to the ADA retroactively as to Plaintiff's claims for monetary relief
(but saved for another day the issue of whether the Court would apply the ADA amendment to Plaintiff's
claims for prospective relief), see Mem. & Ord., Docket No. 48, it is still appropriate to view Sutton in the
context of Congress' recent pronouncements about its original legislative intent. As the Ninth Circuit
noted in Rohr in reversing summary judgment to the defendant, "[w]hile we decide this case under the
ADA, and not the ADAAA, the original congressional intent as expressed in the amendment bolsters our
conclusions." 555 F.3d at 862.

Moreover, the Court may also deny summary judgment to Defendants on this issue if there is a genuine issue of material fact as to whether Defendants *regard* Balogh as being disabled.  42 U.S.C. § 12102(2).  As is evident from Defendants' brief, Defendants view Balogh's diabetes as so extremely limiting that they believe she would require 24-hour emergency care (and that non-diabetics would not) and that her diabetes is so severe that she would pose "a direct threat to other people who would need to assist her in the evacuation from war zone posts, including Iraq and Afghanistan."  (Def. Br. at 21).  Defendants denied Plaintiff a waiver of the worldwide availability after finding that her diabetes would require medical evaluation every three months, as well as 24-hour access to a medical facility equipped to deal with diabetic emergencies, including hypoglycemic shock and ketoacidosis.  (Pl.'s Resp. to Defs.' Fact Stmt. ¶ 5).  Indeed, a general matter Defendants consider insulin-dependent Type I diabetes to be a "serious metabolic disease that requires careful medical monitoring, as well as strict compliance to diet, exercise and medication to prevent chronic and acute, life-threatening complications."  (Id.).  At the very least, this evidence is sufficient to create a genuine issue of material fact as to whether Defendants regarded Balogh as having a disability.  For the foregoing reasons, Defendants are not entitled to summary judgment on the issue of whether Balogh has a disability within the meaning of the Rehabilitation Act.

## III.     THE ONLY REMAINING ISSUES MUST BE DECIDED BY A JURY.

As explained in Section I, supra, because there can be no dispute that Balogh's diabetes was the reason for her disqualification from the Foreign Service, the only questions are whether she is disabled and whether she is capable of performing the essential functions of the job, with or without reasonable accommodation.  As to the first

issue, as set forth above and in Plaintiff's summary judgment motion, Balogh is disabled as a matter of law or, at the very least, Defendants are not entitled to summary judgment on this issue.

As to Balogh's capability of performing the essential functions of the job, with or without reasonable accommodation, Defendants have advanced several arguments, many of which are repetitive and/or not relevant to the issues in dispute in this case. Defendants' arguments boil down to the following:  100% worldwide availability is an essential function of the Foreign Service Officer position; Balogh is not 100% worldwide available; and the accommodation of allowing her to serve in the Foreign Service if she were not 100% worldwide available is not reasonable.

It is well settled that, in analyzing a disability discrimination claim, the Court must conduct an individualized assessment of the facts of this particular case.  Indeed, "[t]he Supreme Court has deemed 'essential' individualized attention to disability claims." Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647 (1st Cir. 2000) (citing School Bd. v. Arline, 480 U.S. 273, 287 (1987)).  Specifically, evaluation of a disability discrimination claim requires an "individualized assessment of the individual's present ability to safely perform the essential functions of the job, based on medical or other objective evidence."  Kapche v. City of San Antonio, 304 F.3d 493, 498 (5th Cir. 2002) (internal citations and quotation marks omitted).  Similarly, "[a] careful, individualized review of an accommodation request in light of the specific facts of the case is needed to determine whether the request was reasonable."  Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 23 (1st Cir. 2004); see also Kapche, 304 F.3d at 498 (quoting PGA Tour, Inc. v. Martin, 532 U.S. 661, 668 (2001) ("*an individualized inquiry must be made* to determine

whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration") (emphasis original).   Indeed, the First Circuit has reversed a district court's decision granting summary judgment to the defendant on a disability discrimination when "[i]t appear[ed] from the  court's statement that it was applying per se rules, and not giving the type of individualized assessment of the facts that the Act and the case law requires."  Garcia-Ayala, 212 F.3d at 647.

The Defendants have wholly failed to present evidence from which an individualized assessment could be made of Balogh's ability to perform the essential functions of the job and any reasonable accommodation.  As such, the Court should deny summary judgment to Defendants and send these questions to the jury.

### A.    It is a question of fact for the jury whether 100% worldwide availability is an essential function of the Foreign Service Officer position.

Defendants argue that the State Department's 100% worldwide availability requirement is an essential function of the position.  "An 'essential function' is a fundamental job duty of the position at issue."  Kvorjak v. Maine, 259 F.3d 48, 55 (1st Cir. 2001) (citing 29 C.F.R. § 1630.2(n)(1)).  Factors to be considered in determining whether a function is essential include, inter alia:  (i) "[t]he employer's judgment as to which functions are essential"; "[w]ritten job descriptions prepared before advertising or interviewing applicants for the job"; "[t]he work experience of past incumbents in the job"; and/or "[t]he current work experience of incumbents in similar jobs."  29 C.F.R. § 1620.2(n).

The only "evidence" that Defendants have presented in support of their position that 100% worldwide availability is an essential function of the job are Congressional

pronouncements about Foreign Service Officers being "available to serve in assignments throughout the world" and the importance of "availability for worldwide assignment."  (Def. Br. at 13-14).  However, Defendants' brief and fact statement also include several statements in which they appear to concede that 100% worldwide availability is not "essential," specifically:

- The legislative history makes clear that "absolute and universal insistence on 'worldwide availability' is not required," (Def. Br. at 14);

- Only 85% of Foreign Service Officers are worldwide available and that a small number of candidates do receive a waiver of the worldwide availability requirement,[6] Def. Fact Stmt. ¶ 20; and

- "Foreign Service Officers who become unavailable for worldwide service are not required to leave the Service but are, instead, assigned to posts abroad that can provide for their medical needs."  (Def. Br. at 14).

On this record offered by Defendants, there is clearly a dispute of fact on whether 100% worldwide availability is an essential function of the Foreign Service Officer position.

The D.C. Circuit considered this precise issue in Taylor v. Rice, in which the plaintiff claimed that the State Department's policy preventing HIV-positive individuals from serving in the Foreign Service constituted disability discrimination.  451 F.3d 898 (D.C. Cir. 2006).  There, the State Department argued that 100% worldwide availability was an essential function of the position and that Taylor's ability to serve in only 68% of posts rendered him unqualified.  The D.C. Circuit reversed the district court's grant of summary judgment to the State Department, holding, inter alia, that there was "a genuine

---

[6]    The fact that the State Department's current policy on the granting of waivers is that it considers whether the individual has any special skill is completely irrelevant to the reasonableness of any accommodation.  It is not a defense to disability discrimination that the State Department chose to establish criteria other than ensuring its compliance with disability laws in determining who would be entitled to a waiver.

issue of material fact regarding the extent to which Foreign Service Officers must be

available to serve in overseas posts." 451 F.3d at 392.

Notably, the Taylor court analyzed the very same statutes and regulations on

which Defendants rely here and concluded that they did not establish 100% worldwide

availability as an essential function of the Foreign Service Officer position. The court

explained:

> These general terms do not specify how many posts officers must be available to
> fill. The fact that a candidate cannot go everywhere in the world does not
> necessarily mean that he is not available "on a worldwide basis." 22 C.F.R. §
> 11.1(e)(2). For example, after stating that candidates "must be available for
> worldwide assignment," the Foreign Service Career-Candidate Guidebook 2001-
> 2002 states that "Foreign Service employees must be able to serve in a wide
> variety of overseas posts." . . . The Foreign Service statute and regulations
> therefore do not indicate precisely what level of worldwide availability is essential
> for Foreign Service Officers.

Id. at 906-07. The court went on to note the disputed record evidence on the extent to

which the State Department in fact requires worldwide availability. Specifically:

> There is evidence suggesting that, in practice, the Secretary does not require
> every Foreign Service Officer to be available to serve everywhere in the world.
> This is apparent from the fact that some candidates unable to serve at every
> overseas Foreign Service post are nevertheless hired with Class 2 clearances.
> The Secretary admits that between 1998 and 2002 the Foreign Service hired
> twelve candidates who were given Class 2 medical clearances because of their
> asthma. . . Other evidence is to the same effect. Ambassador A. Peter Burleigh,
> who spent more than thirty years as a Foreign Service Officer, testified that "the
> day-to-day realities of Foreign Service assignment procedures and practices ...
> often deviate substantially from th[e] formal requirements." . . . He explained that
> "[a]t any given time ... between one-quarter and one-third of in-service [Foreign
> Service Officers] ... are not available for worldwide assignment" for a variety of
> reasons. He further testified that "[t]his is true for junior, mid-level, and senior
> [Foreign Service Officers]." One of the Secretary's witnesses—William R. Mullican,
> Office Director in the Bureau of Human Resources—gave similar testimony,
> estimating that "15% of the Generalists and 16% of the Specialists are currently
> restricted from world-wide availability due to medical conditions," a figure that does
> not account for other Foreign Service Officers who might be unavailable for other
> reasons.

Id. at 907. This evidence, coupled with the evidence cited by Defendants in this case that

not all Foreign Service Officers are required to be worldwide available, creates similar

factual disputes on whether 100% worldwide availability is an essential function of the Foreign Service Officer position.  Accordingly, Defendants are not entitled to summary judgment on this issue.

**B.    It is a question of fact for the jury whether Balogh is 100% worldwide available.**

Defendants' most egregious omission in their brief is that they have failed to present any evidence from which it could be determined that Balogh is not 100% worldwide available, *i.e.*, that she could not perform the essential functions of the job as Defendants define them.  It is undisputed that the only reason Balogh was denied worldwide available status was that she has Type I diabetes and the State Department has a blanket policy of denying worldwide available status to anyone with Type I diabetes, without regard to their specific medical circumstances.  Other than the fact of the denial, Defendants have presented absolutely no evidence that Balogh is not in fact worldwide available (*i.e.*, that she could not manage her diabetes safely in any post worldwide). Indeed, the only fact specific to *Balogh's* ability to perform the essential functions of the job that Defendants include in their fact statement is that "Plaintiff's current and former health care providers have written assessments to the State Department, indicating that her condition does not impair her ability to carry out the essential functions of the applied-for Foreign Service position."  Def. Fact. Stmt. ¶ 3.  Defendants have presented no evidence challenging this opinion of Balogh's health care providers, and they use this fact as evidence *in support of their motion*.  Accordingly, Defendants should be deemed to have conceded that Balogh is capable of performing the essential functions of the job (as Defendants have conceived them).

The only facts presented by Defendants that could even arguably go to their point that Balogh is not worldwide available are several general and vague statements about "risks" to "diabetics" generally (not Balogh specifically) in working in some remote posts. Def Fact Stmt. ¶¶ 13-16. Defendants have not presented any individualized evidence of Balogh's inability to serve as a Foreign Service Officer worldwide (other than the fact of the State Department's blanket ban). Indeed, Defendants make no effort to apply their general statements about diabetes to Balogh specifically. Moreover, many of the statements made by Defendants in their fact statement about diabetes are incorrect as a general matter and/or inapplicable to Balogh specifically.

The only evidence specific to Balogh in the summary judgment record are the report of Plaintiff's expert witness, Dr. Daniel Lorber, and his affidavit filed today in support of Plaintiff's opposition to Defendants' summary judgment motion. Dr. Lorber's evaluation of Balogh's management of her diabetes establishes that the general concerns raised by Defendants about diabetics are inapplicable to Balogh (and/or incorrect altogether). First, in his expert report, Dr. Lorber made the following observations about Balogh's management of her diabetes:

- "Ms. Balogh's expertise in managing her diabetes and her extreme sensitivity to fluctuations in her blood sugars has enabled her to avoid emergency room or hospital visits related to diabetes since the time of her diagnosis with the exception of her eye surgery."

- "[S]evere hypoglycemia requiring the assistance of another (which Ms. Balogh has never experienced) can be adequately managed by a layperson with the injection of Glucagon, a hormone that comes in a preset kit. Glucagon is commonly used by family members for the treatment of severe hypoglycemia."

- "Ms. Balogh has not had an episode of diabetic ketoacidosis since childhood. Nonetheless, I am quite sure that she can avert and if necessary treat this complication, as I have many patients who self-treat ketoacidosis by use of oral hydration solutions, antiemetics, and additional injections of rapid acting insulin such as Balogh uses in her pump."

(Pl.'s Ex. B at 4, Docket No. 51).

Moreover, in his affidavit, Dr. Lorber explicitly refutes the statements of Defendants about diabetes and about the application of their purported concerns about diabetes management to Balogh specifically.  Specifically, Dr. Lorber explains the following in his affidavit:

- "In paragraph 13 of their statement of facts, the Defendants claim that there are 'many places in the world where it is very difficult to care for diabetics if their blood sugar fluctuates.' This appears to be a misunderstanding of diabetes, and Dr. Thomas Yun, whose opinions serve as the basis for this statement, does not profess to have expertise in diabetes care. Local medical care is no more necessary for an experienced patient with diabetes than for any other person. Blood sugar 'fluctuates' for all people. Indeed, regardless of whether they have diabetes and regardless of where a person is located— whether it be Boston or South Africa—the treatment for a high blood sugar is insulin."

- "Also in paragraph 13 of their statement of facts, Defendants claim that numerous hardship post 'lack local medical care,' and present 'a risk of infections and diseases such as malaria and dengue fever' which 'make it very difficult to control diabetes.' Yet Ms. Balogh's diabetes requires only that she receive insulin and carbohydrates, two things which every country in the world has. In fact, local medical care is no more necessary for an experienced patient with diabetes than for any other person, since experienced diabetics, such as Ms. Balogh, know how to adjust insulin during illness. Moreover, even if a patient has high blood glucose readings, the treatment is insulin, which can be self administered. Put another way, Defendants appear to treat all people alike when it says that infections 'would' make it 'very difficult' to control diabetes, but this is fundamentally flawed. For some people diabetes is 'very difficult to control' during illness, but for others, it is not. Defendants' attempt to lump all people together is merely a generalization and stereotype."

- "In paragraph 14 of their statement of facts, the Defendants claim that, 'if a diabetic's insulin regime is insufficient, then the diabetic may suffer from high blood sugar, which can cause diabetic ketoacidosis and other complications.' While this risk is present for diabetics generally, Ms. Balogh has demonstrated an excellent ability to care for her diabetes and has had neither severe hypoglycemia nor ketoacidosis in many years. This betrays a further significant medical flaw in the Defendants' statements of fact and the reasoning upon which those statements are premised. Some diabetics are at significant risk of ketoacidosis. Some are not. Ms. Balogh falls into the latter category."

- "In paragraph 15 of their statement of facts, the Defendants claim that, 'although diabetics can regulate their insulin themselves in normal, usual conditions, the insulin requirement changes drastically if a diabetic has malaria or severe diarrhea.' Again, while this is true as a general matter, experienced diabetics such as Ms. Balogh are able to simply increase their insulin dosage as they observe their blood sugar levels rising. And again, Defendants lumps all individuals together when in fact well controlled individuals like Ms. Balogh know how to factor in illness when dosing insulin."

- "In paragraph 16 of their statement of facts, the Defendants claim that it cannot remove an individual from an overseas post every time 'something goes out of the ordinary' and that this is particularly a concern with diabetics. This concern is irrelevant with respect to Ms. Balogh and improper as a general matter with regards to diabetics. As I discussed in my original expert report for this matter, Ms. Balogh is perfectly capable of preventing and self-managing diabetic hyperglycemic emergencies. She has not had hypoglycemia requiring the assistance of another in several years. If this were to occur, any other person could administer an injection of glucagons, which are widely available in pre-packaged kits. Indeed, parents and spouses perform this mundane procedure every day of the year in numerous countries around the world. Moreover, the treatment for high blood glucose readings is insulin, which is available in every country in the world, and the treatment for low blood glucose is carbohydrates, which is also available everywhere. There is simply would be no reason to evacuate Ms. Balogh, even if she were to become ill, since she can treat her diabetes with ordinary insulin."

- "In paragraph 19 of their statement of facts, the Defendants claim that the 'American Diabetes Association recommends that a Type I diabetic have access to an adequate 24-hour emergency room.' This is incorrect. The ADA Standards of Medical Care in Diabetes do not require nor suggest that Type I diabetics have 24-hour access to an 'adequate' emergency room. The ADA Clinical Practice Recommendations actually states the opposite, condemning 'blanket bans' and lumping all people with diabetes together. To the contrary, the ADA calls for individualized assessment because the 'effects of diabetes vary greatly from person to person.'"

(Pl.'s Fact. Stmt. ¶¶ 11-17).

In light of Defendants' utter failure to produce any evidence about how Balogh's diabetes would affect her ability to serve worldwide, at best for Defendants, there is a genuine issue of material fact precluding summary judgment to them on Balogh's capability of performing the essential functions of the job.

Indeed, several courts have concluded that a defendant's failure to conduct an individualized assessment on this point sufficed either to deny summary judgment or to find liability. In McGregor v. Nat'l R.R. Passenger Corp., the Ninth Circuit affirmed the district court's denial of summary judgment to the defendant, holding that, if the defendant had a policy that employees could only return to work when they were "100% healed," that would constitute a "*per se* violation[] of the ADA." 187 F.3d 1113, 1116 (9th Cir. 1999). The court explained: "A '100% healed' or 'fully healed' policy discriminates

17

against qualified individuals with disabilities because such a policy permits employers to substitute a determination of whether a qualified individual is '100% healed' from their injury for the required individual assessment whether the qualified individual is able to perform the essential functions of his or her job either with or without accommodation."

Id.  In Taylor v. Pathmark Stores, Inc., the Third Circuit observed:

> [I]t is not reasonable for an employer to extrapolate from information provided by an employee based on stereotypes or fears about the disabled, and we think that the distinction between the effects of a *type* of impairment and an impairment's *extent* adequately captures the distinction: A belief that anyone with bipolar disorder or HIV infection is substantially limited in a major life activity is a conclusion about the effects of the impairment and only secondarily about the particular employee. An employer with such a belief is failing to make an individualized determination, as the ADA requires, and thus acts at its peril . . .

177 F.3d 180, 193 (3d Cir. 1999) (emphasis original).

Here, Defendants' blanket policy of prohibiting Type I diabetics from obtaining worldwide medical clearance plainly violates this mandate.  As Defendants themselves concede, all candidates for the Foreign Service must obtain worldwide medical clearance, but Defendants categorically exclude Type I diabetics from ever receiving such clearance. (Pl.'s Fact Stmt. at ¶¶ 46-47).  This blanket ban does not take into consideration the individualized circumstances of each applicant, but are instead based upon general theories and beliefs concerning the limitations imposed by Type I diabetes.  Yet as numerous courts have recognized, such blanket bans are *per se* discriminatory and invalid under the ADA.  See, e.g., Kapche v. City of San Antonio,  304 F.3d 493, 500 (5th Cir. 2002) ("[B]lanket exclusion" of insulin-dependent diabetics from serving in the city police force invalid under ADA; "[a]n individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person"), quoting Toyota Motor, 534 U.S. at 122; Bombrys v. City of

Toledo, 849 F. Supp. 1210, 1219 (N.D. Ohio 1993) (invalidating blanket ban on allowing insulin-dependent diabetics from serving in city police force; "[a]t worst, the City's blanket exclusion is impermissibly based upon generalizations and stereotypes"); Millage v. City of Sioux City, Iowa, 258 F. Supp. 2d 976, 995 (N.D. 2003) ("[D]etermination of whether or a not claimant under the ADA can perform the essential functions of a particular job must be based upon an 'individualized assessment' of his or her ability to perform the job safely, and cannot be based simply on a blanket exclusion").

Thus, as set forth in Plaintiff's motion for summary judgment, Defendants' policy of excluding Type I diabetics from the Foreign Service by denying them worldwide medical clearance must be struck down as facially discriminatory.

> **C.      It is a question of fact for the jury whether the accommodation of allowing Balogh to serve in the Foreign Service if she were not 100% worldwide available (or any other accommodation) is reasonable.**

Because Defendants have failed to establish entitlement to summary judgment on Balogh's inability to perform the essential functions of the job even without accommodation, the Court need go no further.  However, Defendants' motion is also woefully deficient on the reasonableness of any accommodation.  As the First Circuit has explained, "an employer who knows of a disability yet fails to make reasonable accommodations violates the statute, no matter what its intent, unless it can show that the proposed accommodations would create undue hardship for its business."  Higgins, 194 F.3d  at 264.

Defendants have contemplated only one possible accommodation that the State Department could make in Balogh's case—waiver of the worldwide availability requirement.  In fact, Plaintiff takes the position that Balogh is worldwide available, *i.e.*,

capable of serving at all Foreign Service posts.  Any accommodations she may need

would be simple to provide—*e.g.*, permission to use her allotted leave to visit her doctor

and get a six- to nine-month supply of insulin, permission to bring portable refrigeration

devices with her to store her insulin, etc.  Defendants have not even argued that such

lesser accommodations would be unreasonable.

      Even assuming that Balogh's diabetes might prevent her from being available to

serve in some locations, however, Defendants have not met their burden of establishing

that such an accommodation would be unreasonable.  The only facts that Defendants

have offered in support of their argument are general statements that worldwide

availability:  allows the Foreign Service to "effectively and fairly staff all of its posts,"

ensures "some equity within the service"; "is essential to morale because it ensures a

level of fairness."  (Def. Fact Stmt. ¶¶ 9, 17).  However, as discussed in Section III.A,

<u>supra</u>, Defendants have conceded that not all members of the Foreign Service are

required to be worldwide available.

      Defendants' argument that allowing Balogh to serve with less than 100%

worldwide availability is unreasonable must fail because Defendants once again have

included no facts specific to Balogh.  They do not even estimate the percentage of posts

(if less than 100%) at which she would be available to serve.  Because of this lack of any

individualized assessment, Defendants' argument that they could not provide reasonable

accommodation to Balogh as a matter of law must be rejected.  The <u>Taylor</u> court similarly

reversed summary judgment to the defendant on the issue of reasonable accommodation

because "the parties genuinely dispute the level of worldwide availability essential for

Foreign Service Officers," so the court had "no way of knowing" whether Taylor's

proposed accommodation of being sent only to a post that could treat his HIV

(approximately 68% of posts) "would effectively do away with an essential function."  451

F.3d at 909.[7]

### D.    Defendants are not entitled to summary judgment on either the "business necessity" or "direct threat" defenses.

In a final attempt to evade liability, Defendants argue that they are entitled to

summary judgment based on the "business necessity" and "direct threat" defenses.   Yet,

as with the McDonnell Douglas test, the business necessity defense has no place in this

action.  The business necessity defense arises "[i]n only a very specific type of Title VII

case," Chalk v. Secretary of Labor, U.S. Dept. of Labor, 565 F.2d 764, 767 n.2 (C.A.D.C.

1977), namely in those cases where a plaintiff challenges a standardized policy that is

**neutral on its face** but which has a discriminatory impact upon a certain group of

individuals.  See Ferrill v. Parker Group, Inc., 168 F.3d 468, 474 (11th Cir. 1999)

(business necessity defense only available "[w]hen a facially neutral practice is

challenged for its disparate impact"); E.E.O.C. v. Northwest Airlines, Inc., 1987 WL

59590, at *5 (W.D. Wash. 1987) ("[Bona fide occupational qualification] defense and the

business necessity defense are not interchangeable . . . the BFOQ defense is applicable

to disparate treatment violations and the business necessity defense is applicable to

disparate impact violations").  Here, by contrast, Balogh is not alleging that Defendants'

policy of categorically denying worldwide clearance to Type I diabetics is "facially neutral"

but disparately impacts diabetics.  Quite the opposite: Balogh contends that Defendants'

policy categorically excludes Type I diabetics from appointment to the Foreign Service by

---

[7]      The Taylor court also reversed summary judgment on Taylor's other proposed accommodation—
that he be sent to any post but be permitted to use allotted leave time to obtain medical care—because
there was a dispute of fact as to how burdensome that accommodation would be.  451 F.3d at 909-10.

specifically denying them worldwide medical clearance.  Thus, the business necessity

defense is wholly inapplicable to this case, and Defendants' attempt to justify their policy

misses the mark.

Defendants' claim that Balogh's disability poses a "direct threat" to her own safety

and the safety of others in the Foreign Service is similarly unavailing.  The ADA does

permit employers to impose "a requirement that an individual shall not pose a direct threat

to the health or safety of other individuals in the workplace."  42 U.S.C. § 12113(b).  A

"direct threat" that may justify a discriminatory policy must be "'a significant risk of

substantial harm to the health or safety of the individual . . . that cannot be eliminated or

reduced by reasonable accommodation.'"  Taylor, 451 F.3d at 906 (quoting 29 C.F.R. §

1630.2(r)).  As the Supreme Court has explained:  "The direct threat defense must be

'based on a reasonable medical judgment that relies on the most current medical

knowledge and/or the best available objective evidence,' and upon an expressly

'individualized assessment of the individual's present ability to safely perform the

essential functions of the job,' reached after considering, among other things, the

imminence of the risk and the severity of the harm portended."  Chevron USA, Inc. v.

Echazabal, 536 U.S. 73, 86 (2002) (quoting 29 C.F.R. § 1630.2(r)).  In Taylor, the D.C.

Circuit held that there were genuine disputes of fact precluding summary judgment for the

State Department on the "direct threat" defense.  451 F.3d at 911.

Once again, Defendants' failure to offer any specifics as to how Balogh's condition

would pose a direct threat is fatal.  They claim without any specific evidence whatsoever

that "plaintiff's medical condition makes her a direct threat to herself and others because

of the conditions at a significant number of posts and the inadequate medical care."  (Def.

Br. at 22-23).  This conclusory and unsubstantiated statement is insufficient to establish that "the employee cannot perform the job without a significant risk of harm."  <u>Nunes v. Wal-Mart Stores, Inc.</u>, 164 F.3d 1243, 1248 (9th Cir. 1999).  As such, Defendants cannot satisfy the "direct threat" defense.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' summary judgment motion.

Respectfully submitted,

ANNA BALOGH,

By her attorneys,


 /s/ Hillary Schwab
Harold L. Lichten, BBO #549689
Hillary Schwab, BBO #666029
LICHTEN & LISS-RIORDAN, P.C.
100 Cambridge Street, 20th Floor
Boston, MA 02114
Dated:  November 10, 2009                    (617) 367-7200

## CERTIFICATE OF SERVICE

I hereby certify that on November 10, 2009, I caused a copy of this document to be served by electronic filing on Rayford A. Farquhar, Esq., U.S. Attorney's Office, Moakley Courthouse, Suite 9200, One Courthouse Way, Boston, Massachusetts 02210, counsel for Defendants.


/s/ Hillary Schwab
Hillary Schwab, Esq.

24